**KRISS & FEUERSTEIN LLP**
360 Lexington Avenue, Suite 1200
New York, New York 10017
(212) 661-2900
(212) 661-9397 – facsimile
Jerold C. Feuerstein, Esq.
Daniel N. Zinman, Esq.
Stuart L. Kossar, Esq.
jfeuerstein@kandfllp.com
dzinman@kandfllp.com
skossar@kandfllp.com

*Attorneys for 159 Broadway Avenue 1 LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| WB BRIDGE HOTEL LLC and<br>159 BROADWAY MEMBER LLC, | Case No. 20-23288 (rdd) and<br>20-23289 (rdd)<br>(Jointly Administered) |
| Debtors. | |

------------------------------------------------------------x

**159 BROADWAY AVENUE 1 LLC'S OBJECTION TO THE DEBTORS'APPLICATION FOR THE ENTRY OF AN ORDER TO EXTENDING EXCLUSIVE RIGHT TO FILE A PLAN OF REORGANIZATION AND TO SOLICIT ACCEPTANCES TO THEIR PLAN**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

159 Broadway Avenue 1 LLC ("159 Broadway Lender" and/or "Secured Creditor"), a secured creditor and mortgagee of the debtor, WB Bridge Hotel LLC (the "Land Borrower") in this jointly administered Chapter 11 Case (the "Bankruptcy Case"), by and through its attorneys, Kriss & Feuerstein LLP, respectfully submits this Objection (the "Objection") to the Land Borrower's and 159 Broadway Member LLC's (the "Mezz Borrower" and together with the Land Borrower, collectively, the "Debtors") Application for the entry of an order pursuant to Section 1121 of Title 11 of the United States Code (the "Bankruptcy Code") extending the Debtors'

1

exclusive periods in which to file a Chapter 11 plan and solicit acceptances thereof (the "Exclusive Periods") filed on April 1, 2021 [ECF No. 50] (the "Exclusivity Application"). In support of its Objection, Secured Creditor respectfully submits as follows:

## PRELIMINARY STATEMENT

1.  Notwithstanding the fact that this case has been pending for almost 120 days as of the date hereof, the Debtors have failed to demonstrate that extending the Exclusive Periods for another 120 days will bring them any closer to being able to confirm a plan the Debtors could propose. Due to these delays, the Exclusivity Application is a stalling tactic and must be denied.

2.  The Debtors' bankruptcy case is simple and straightforward. The Mezz Borrower is the 100% owner of the Land Borrower, which owns the real property commonly known as 159 Broadway, Brooklyn, NY 11211 (Block: 2457, Lots: 34 and 9039) (the "Property"), encumbered by the Secured Creditor's lien on the Property. The Debtors have failed to develop the Property since Secured Creditor's loan to the Land Borrower originated in June 2019. The Debtors can simply submit a plan of reorganization to market the property for refinancing purposes or private sale and (if unsuccessful) sell the Property at public auction. This does not require another 120 days.

3.  Although the Debtors claims to believe the "Property is a viable project with significant upside potential and have spent their time since filing determining the best way in the current economic client to carve out a pathway towards reorganization," there is no evidence of any efforts to do so. [*See* Application, at ¶ 4]. The Debtors have failed to retain any professionals that might further their "reorganization" such as a broker or other financial professional. In addition, the Exclusivity Application fails to attach any documents or affidavits from someone with personal knowledge substantiating these "reorganization efforts".

2

4.       The Debtors have not earned an additional 120 days to extend the Exclusive Periods because they have not engaged in any plan negotiations with their creditors and have failed to provide any basis to extend exclusivity. Granting the exorbitant 120-day requested extension is more likely to inhibit reorganizational efforts than foster them in this very simple case.

5.       As the Debtors have failed to meet their burden to demonstrate "cause" for an extension of exclusivity, this Court should deny the Exclusivity Application in its entirety.

## BACKGROUND

**Secured Creditor's Land Loan, Project Loan and Building Loan**

6.       On June 18, 2019, the Land Borrower duly executed, acknowledged, and delivered to Secured Creditor a Consolidated, Amended and Restated Note (the "Land Loan Note"), in the principal amount of $21,350,000.00 (the "Land Loan") (See Claim No. 10-2).

7.       On June 18, 2019, to secure repayment of the indebtedness evidenced by the Land Loan Note, the Land Borrower duly executed, acknowledged, and delivered to Secured Creditor, a Consolidated, Amended and Restated Mortgage and Security Agreement (the "Land Loan Mortgage"), in the amount of $21,350,000.00 encumbering the Property. The Land Loan Mortgage was recorded on July 5, 2019 in the Office of the City Register of the City of New York, County of Kings (the "City Register") under City Register File No. ("CRFN"): 2019000210728 (See Claim No. 10-2).

8.       On June 18, 2019, as further security for the Note, Yitzchok Hager and Shifra Hager (the "Guarantors"), individually, duly executed, acknowledged, and delivered to Secured Creditor, a Guaranty (the "Land Loan Guaranty"), wherein the Guarantors guaranteed the repayment of all sums due under the Land Loan (See Claim No. 10-2).

9. On June 18, 2019, as additional security for the Note, Guarantors, individually, duly executed, acknowledged, and delivered to Secured Creditor, a Conditional Guaranty (the "Land Loan Conditional Guaranty") (See Claim No. 10-2).

10. On June 18, 2019, to further induce Secured Creditor, Guarantors individually, duly executed, acknowledged, and delivered to Secured Creditor, a Debt Service and Carry Guaranty (the "Land Loan Debt Service and Carry Guaranty"), wherein the Guarantor, unconditionally guaranteed the performance and repayment of all costs incurred in connection with the operation, maintenance, and management of the Property (See Claim No. 10-2).

11. On June 18, 2019, to further induce Secured Creditor, Guarantors individually, duly executed, acknowledged, and delivered to Secured Creditor, a Guaranty of Completion (the "Land Loan Completion Guaranty"), wherein the Guarantor, unconditionally guaranteed the performance of the Land Borrower of all terms and provisions of the Land Loan (See Claim No. 10-2).

12. The Land Note, Land Loan Mortgage, Land Loan Guaranty, Land Loan Conditional Guaranty, Land Loan Debt Service and Carry Guaranty, and Land Loan Completion Guaranty, and together with all other documents and/or agreements that were executed and/or delivered in connection with the Land Loan, are herein collectively referred to as (the "Land Loan Documents").

13. On November 1, 2019, the Land Borrower duly executed, acknowledged, and delivered to Secured Creditor a Project Loan Note (the "Project Loan Note"), in the principal amount of $369,001.69 (the "Project Loan") (See Claim No. 10-2).

14. On November 1, 2019, to secure repayment of the indebtedness evidenced by the Project Loan Note, the Land Borrower duly executed, acknowledged, and delivered to Secured Creditor, a Project Loan Mortgage and Security Agreement (the "Project Loan Mortgage"), in the

4

amount of $369,001.69 encumbering the Property. The Project Loan Mortgage was recorded on November 15, 2019 in the City Register under CRFN: 201900373430 (See Claim No. 10-2).

15. The Project Note, Project Loan Mortgage, and together with all other documents and/or agreements that were executed and/or delivered in connection with the Project Loan, are herein collectively referred to as (the "Project Loan Documents").

16. On November 1, 2019, the Land Borrower, duly executed, acknowledged, and delivered to Secured Creditor a Building Loan Note (the "Building Loan Note"), in the principal amount of $2,280,998.31 (the "Building Loan") (See Claim No. 10-2).

17. On November 1, 2019, to secure repayment of the indebtedness evidenced by the Building Loan Note, the Land Borrower, duly executed, acknowledged, and delivered to Secured Creditor, a Building Loan Mortgage and Security Agreement (the "Building Loan Mortgage"), in the amount of $2,280,998.31 encumbering the Property. The Building Loan Mortgage was recorded on November 15, 2019 in the City Register under CRFN: 2019000373427.

18. On November 1, 2019 in connection with the Building Loan, Land Borrower, duly executed, acknowledged, and delivered to Secured Creditor, a Building Loan Agreement (the "Building Loan Agreement") (See Claim No. 10-2).

19. On November 1, 2019, to further induce Secured Creditor, Guarantors individually, duly executed, acknowledged, and delivered to Secured Creditor, a Guaranty of Completion (the "Building Loan Completion Guaranty"), wherein the Guarantor, unconditionally guaranteed the performance of the Land Borrower of all terms and provisions of the Land Loan (See Claim No. 10-2).

20. The Building Note, Building Loan Mortgage, Building Loan Agreement, and Building Loan Completion Guaranty, and together with all other documents and/or agreements

5

that were executed and/or delivered in connection with the Building Loan, are herein collectively referred to as (the "Building Loan Documents").

**The Mezzanine Loan**

21. On November 1, 2019, 159 Broadway Mezz LLC (the "Mezz Lender"), made a mezzanine loan in the sum of $100,000.00 to the Mezz Borrower (the "Mezz Loan") pursuant to a Mezzanine Loan Agreement (the "Mezzanine Loan Agreement") (*See* **Exh. B**).

22. On November 1, 2019, the Mezz Borrower duly executed, acknowledged, and delivered to the Mezz Lender a Mezzanine Promissory Note (the "Mezz Note") in the principal amount of $100,000.00 in connection with the Mezz Loan (*See* **Exh. B**).

23. On November 1, 2019, as further security for the Mezz Note, the Mezz Borrower duly executed, acknowledged, and delivered to the Mezz Lender an Ownership Interests Pledge and Security Agreement (the "Pledge Agreement") (*See* **Exh. B**).

**The Land Loan Defaults, Foreclosure Action and UCC Sale**

24. The Land Borrower failed to comply with the terms and provisions of the Land Loan Documents, for, among other things, among other things, (i) failure to pay the real estate taxes due on January 1, 2020 and July 1, 2020 (the "Land Loan Tax Default") and (ii) failure to pay the monthly interest payment due on April 1, 2020 and every subsequent payment thereafter, in accordance with the terms of the Land Loan Documents (the "Land Loan Interest and Monthly Payment Default" and together with the Land Loan Tax Default, collectively, the "Land Loan Payment Default") (*See* **Exh. A**, at ¶¶ 13-20).

25. The Land Borrower also failed to comply with the terms and provisions of the Land Loan Documents by failing to discharge/ bond mechanic's liens, including the following: (i) mechanics lien docketed on December 5, 2019 in control no. 003916400-01 by Simpson Gumpertz

6

& Heger Inc., lienor, against the Property in the amount of $33,620.22 (the "First Mechanic's Lien Default"), (ii) mechanics lien docketed on May 19, 2020 in control no. 003941759-01 by Prime Mix Corp., lienor, against the Property in the amount of $55,177.87 (the "Second Mechanic's Lien Default"); (iii) mechanics lien docketed on March 18, 2020 in in control no. 003940028-01 by Sub Enterprises Inc., lienor, against the Property in the amount of $276,962.27 (the "Third Mechanic's Lien Default" and together with the First Mechanic's Lien Default and Second Mechanic's Lien Default, collectively, the "Mechanic's Lien Default") (*See* **Exh. A**, at ¶ 21).

26. Further, the Land Loan matured on July 1, 2020 (the "Land Loan Maturity Date") and Land Loan Borrower failed and omitted to pay the entire debt which came due and owing on the Land Loan Maturity Date (the "Land Loan Maturity Default", and together with the Land Loan Payment Default and Mechanic's Lien Default, collectively the "Land Loan Defaults") (*See* **Exh. A**, at ¶¶ 22-23).

27. On July 29, 2020, as result of the Land Loan Defaults,[1] pursuant to the terms of the Loan Documents, Secured Creditor declared the balance of the principal indebtedness immediately due and payable and commenced a commercial mortgage foreclosure action (the "Foreclosure Action") in the Supreme Court of the State of New York, County of Kings (the "State Court") under Index No. 604354/2020 in the mater originally styled *85 Flatbush Avenue 1 LLC v. 85 Flatbush HO Hotel LLLC, et al*. The Summons (the "Summons") and Complaint (the "Complaint") were filed in the Clerk's Office on July 29, 2020. A copy of the Summons and Complaint is annexed hereto as **Exhibit "A"**.

28. To date, Land Borrower and the Guarantors have not appeared or interposed an answer to the Complaint in the Foreclosure Action.

---

[1] In addition to the Land Loan Defaults, the Land Loan Borrower also defaulted under the Building Loan Documents and Project Loan Documents (*See* **Exh. A**, at ¶¶ 52-68, 89-103).

7

29. In addition, due to the Mezz Borrowers default under the Mezzanine Loan, pursuant to the terms the Mezzanine Loan Agreement and Uniform Commercial Code, the Mezz Lender issued a Notification of Disposition of Collateral (the "UCC Sale Notice") scheduling a UCC Sale (the "UCC Sale") of the collateral for October 10, 2020 that was subsequently adjourned to December 21, 2020 (the "UCC Sale"). A copy of the UCC Sale Notice is annexed hereto as **Exhibit "B".**

**The Instant Bankruptcy Filing**

30. On December 21, 2020 (the "Petition Date"), the Debtors each filed a Petition (the "Petition") for relief under Chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the Southern District of New York staying the UCC Sale and Foreclosure Action.

31. On January 4, 2021, this Court entered an order to jointly administer the Debtors' bankruptcy cases [ECF No. 12].

32. On March 9, 2021, a meeting of creditors was held pursuant to 11 U.S.C. § 341.

33. On March 15, 2021, this Court entered an order establishing a non-government claims bar date of April 21, 2021 [ECF No. 45].

34. The Debtors' exclusive right to file a plan of reorganization expires on April 20, 2021.

35. On April 1, 2021, Debtors filed the Exclusivity Application [ECF No. 50].

36. On April 19, 2021, Secured Creditor filed its proof of claim, which was subsequently amended [Claim 10-2].

37. On April 21, 2021, Mezz Lender filed an objection to the Exclusivity Application [ECF No. 52].

38.     On May 10, 2021, Debtor filed a notice scheduled a hearing on the Exclusivity Application on June 11, 2021 [ECF No. 55].

**OBJECTION**

**POINT I**

**DEBTORS FAIL TO MEET THEIR BURDEN TO ESTABLISH CAUSE TO EXTEND EXCLUSIVITY**

39.     Pursuant to Section 1121(b) of the Bankruptcy Code, only a debtor in possession may file a plan within the 120–day exclusivity period or any extensions authorized by the court. 11 U.S.C. § 1121(b).  However, pursuant to Section 1121(d)(1) of the Bankruptcy Code, the court may extend the exclusive period "for cause".  11 U.S.C. § 1121(d)(1).  Section 1121 of the Bankruptcy Code is intended to promote the debtor's ability to reorganize and develop a consensual plan with its creditors but, "[a]t the same time, the [Bankruptcy Code] recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company." H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 231–32 (1978); *See, In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987). Exclusivity should not be wielded as a method to wear creditors down and get them to acquiesce to a plan that they do not support.  *See, e.g., In re Gen. Bearing Corp.*, 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors."); *see also In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014) (*citing* H.R. Rep. No. 95-595, at 231 (1977)) (noting that Congress intended to limit the "perpetual exclusivity" granted to Debtors in the Bankruptcy Act).

40.     The movant has the burden of demonstrating cause, "which requires [that] an affirmative showing . . . supported by evidence, be made by the party seeking the extension . . . ."

*See In re R.G. Pharmacy, Inc.,* 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (citation and internal quotation marks omitted)). A debtor has the burden of proof to make "a clear showing" that cause exists to support an extension of exclusivity. *In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011). Where the Debtor faces opposition, the motion should be denied in the absence of a "clear showing" of cause. *See In re Curry Corp.*, 148 B.R 754, 756 (Bankr. S.D.N.Y. 1992).

41.     The Bankruptcy Code does not define "cause." As such, courts typically employ the factors test in *In re Adelphia Communications Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) to extend the duration of exclusivity in its analysis of factors (the "Adelphia Factors"). The Adelphia Factors include:

1) The size and complexity of the case;
2) The necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
3) The existence of good faith progress toward reorganization;
4) Whether the debtor is paying its bills as they become due;
5) Whether the debtor has demonstrated reasonable prospects for filing a viable plan;
6) Whether the debtor has made progress in negotiations with its creditors;
7) The amount of time which has elapsed in the case;
8) Whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
9) Whether an unresolved contingency exists.

Id. at 176. However, an extension is warranted only "in unusual circumstances, involving very large or complex cases." *In re Sw. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 452 (Bankr. W.D. Tex. 1987); *see also In re Borders Grp., Inc.*, 460 B.R at 821 ("A court's decision to extend a debtor's exclusive periods is a serious matter; extensions are not granted routinely or cavalierly."). Courts will "not routinely extend the exclusivity period absent a showing of 'cause' when creditors object to such requests for extensions." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 587. As shall be further stated below, Debtors fail to meet their burden under the Adelphia Factors to establish "cause" to extend the duration of exclusivity.

### A. *Factor 1* – **The Size and Complexity of This Case Do Not Warrant an Extension.**

42.     Debtors have not shown why this case is sufficiently large or complex to warrant an extension of exclusivity.  Indeed, this case is not nearly as complex as a case like *Adelphia*.  Additionally, size and complexity alone cannot suffice as "cause" to warrant a debtor's request for an extension of exclusivity; "size and complexity must be accompanied by other factors . . . to justify extension of plan exclusivity." *In re Pub. Serv. Co. of N.H.*, 88 B.R. 521, 537 (Bankr. D.N.H. 1988).  Although the Chapter 11 Cases involve a not insignificant amount of secured debt, they do not present novel or unprecedented issues, nor do they involve a particularly complex corporate or financial structure. *Compare In re Texaco Inc.*, 76 B.R. 322, 327 (Bankr. S.D.N.Y 1987) (size and complexity of Debtors cases weighed in favor of granting exclusivity where "in the history of this country there has never been a Chapter 11 case as large as the Texaco cases.").

43.     Although Debtors claim that this a "$28 million case" and its Secured Creditors are "sophisticated players" in the hotel construction industry, these claims alone do not warrant an extension [*See* Exclusivity Application, at ¶ 9].  This case involves nothing more than Debtors' failed scheme to develop a vacant lot that never came fruition. As Debtors admit, their potential reorganization options are limited to securing new capital, a joint venture, or a sale of the Property [*See* Exclusivity Application, at ¶ 9].  The alleged size and complexity of the Bankruptcy Case does not prohibit movement towards these known outcomes through a proposed plan of organization. The Debtors' failure to offer any reorganization strategy is indicative not of the size and complexity of the cases, but the wholly speculative nature of the Debtors' reorganizational ability.

44.     Accordingly, the size and complexity of this case do not provide "cause" for an extension of the Exclusivity Periods.

B. *Factors 2, 3, and 6* – **There has already been sufficient time to permit the Debtors to negotiate a plan of reorganization and prepare adequate information, there has not been sufficient good faith progress toward reorganization; and the Debtors have not made sufficient progress in negotiations with its creditors.**

45. The Debtors already had sufficient time to negotiate a plan of reorganization and prepare adequate information. Unlike many chapter 11 debtors, these Debtors have no businesses to restructure, few claims to reconcile, and no complicated financials to prepare in aid of plan negotiations. While the Debtors self-servingly assert that they are dealing with brokers for potential refinancing, the Debtors have known since before the filing of the instant bankruptcy case that any plan will necessarily require resolution of creditors' claims [*See* Exclusivity Application, at ¶ 12]. However, there have not been any other efforts by Debtors to negotiate with Secured Creditor.

46. The Court should not extend exclusivity due to the Debtors' self-imposed delays and inactions. Notably, while the Debtors "claim to have been exploring multiple avenues towards reorganization" the Exclusivity Application fails to provide proof of same [*See* Exclusivity Application, at ¶ 12]. The Exclusivity Application fails to provide (among other things) letters of intent, communications, or other documents in furtherance of this efforts. Further, Debtors have not sought permission of this Court to retain a broker or financial institution to advance their "reorganizational plans." In addition, the Debtors fail to present any indication of how reorganizational efforts will be advanced via a 120-day extension of the Exclusivity Periods when they have failed to do anything substantive for months.

47. As such, the Debtors fail to establish the necessity for sufficient time to permit to negotiate a plan of reorganization and prepare adequate information.

C. *Factor 4* – **Given the Limited Bills, Whether the Debtors are Paying Their Bills is Irrelevant.**

48. Although the Debtors do not address this factor, to the extent Debtors claims they are paying their paying their bills as they come due, that is only because the Property is

12

underdeveloped, and expenses are minimal other than property insurance (See ECF No. 46). This factor is thus irrelevant at best and, arguably, weighs against granting an extension to the extent it further demonstrates that the Debtors could have easily been focusing all their energy toward negotiating and prosecuting a chapter 11 plan instead of simply asking for a further extension.

    **D.  *Factors 5* and 7- The Debtors Have not Demonstrated Reasonable Prospects for Filing a Viable Plan, particularly Given the Time That has Elapsed.**

    49.    As set forth more fully in the Exclusivity Application, the Debtors have failed to demonstrate reasonable prospects of filing a viable chapter 11 plan, confirmation of which would require the Secured Creditor's support. To date, no plans or even an outline of a term sheet have been proposed, and there is no evidence that necessary negotiations have progressed or even taken place.

    50.    The Debtors' case has been pending for almost four (4) months and in that time, the Debtors have not shown a reasonable prospect for reorganization or even attempted to present a viable plan. Accordingly, due to the Debtors' failure to file a viable plan or provide any evidence of substantial progress towards a plan, this Court should deny the Exclusivity Application, which will permit the Secured Creditor to file its own plan of reorganization. As such, this factor supports denial of the Exclusivity Application and should be given considerable weight because extending exclusivity would be waste of judicial resources as it would result in further delays.

    **E.  *Factor 8* – The Debtors are Seeking an Extension of Exclusivity to Pressure Creditors to Submit to the Debtors' Reorganizational Plans.**

    51.    The Exclusivity Application should be viewed as an attempt to pressure the creditors into some sort of concession by continuing to forestall their rightful collection efforts, as demonstrated by the complete lack of any progress toward any reorganization. As stated above, the Exclusivity Application reveals that the Debtors have not attempted to negotiate with their

13

creditors. Instead, the Debtors make a variety of self-serving allegations as to exploring potential reorganizational options. Given the lack of substantial progress, the Exclusivity Application would appear to serve no other purpose then to pressure the Creditors by further delaying this matter.

52. The Debtors also self-servingly claim that competing plans will somehow derail reorganization efforts. However, the possibility of competing plans alone does not serve as basis to extend the Exclusivity Periods. *In re Parker St. Florist & Garden Ctr., Inc.*, 31 B.R. 206, 207 (Bankr. D. Mass. 1983) (bare assertion that debtor did not want creditor interfering with reorganization by filing a competing plan was insufficient to make required affirmative showing of cause to extend exclusivity). Moreover, granting Secured Creditor the right to propose its own plan does not prohibit Debtors from filing their own plan. *In re All Seasons Indus. Inc.*, 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (citations omitted) (denying an extension of exclusivity and noting that doing so "does not sound a death knell for debtor's reorganization.... [t]he debtor remains free to take as long as it wishes or feels appropriate to develop and propose its own plan. The risk is, of course, that while it is developing its plan, another party in interest will file a plan. However, that is as Congress intended.").

53. Thus, this factor weighs against extending the Exclusivity Periods.

F. *Factor 9* – **There are no Unresolved Contingencies.**

54. There are no unresolved contingencies that require an extension of exclusivity. As such, this factor weighs against extending exclusivity. Accordingly, the Adelphia Factors overwhelmingly favor denial of any extension of exclusivity.

# POINT II

## DEBTORS' PROPOSED 120-DAY EXTENSION IS EXORBINANT

55.     Assuming *arguendo,* the Debtors could establish "cause" to extend exclusivity, the Debtors' proposed 120-day extension request is excessive.  Notably, the Debtors fail to cite to cases, where shorter extensions were granted (assuming the Debtors establish "cause" for extending exclusivity).  *In re N. Gen. Hosp.*, No. 10-13553 (Bankr. S.D.N.Y. Jan. 21, 2011) [Docket No. 464] (granting 72-day extension, following debtors' request for 90-day extension); *In re Innkeepers USA Trust*, No. 10-13800 (Bankr. S.D.N.Y. Nov. 10, 2010) [Docket No. 699] (extending exclusivity by 75 days, rather than 120 days originally requested by debtors).

56.     Here, as set forth above, there are reasons to be skeptical of the Debtors' request for a such a lengthy extension of 120 days.  As noted, Debtors have made no attempt to negotiate a plan with Secured Creditor – but rather appear to be trying to use the leverage of exclusivity to gain time for procuring investors and buyers for the Property despite having made no efforts to move towards reorganization since commencement of the Bankruptcy Case.

57.     In addition, such a lengthy extension of the Exclusive Periods to August 18, 2021 and October 19, 2021, respectively, is not only excessive but also counterproductive where the Property continues to be underdeveloped and the only potential resolution (as Debtors acknowledge) is either to find new capital or a sale of the Property at public auction [*See* Exclusivity Application, at ¶ 12].  A 120-day extension does not provide any incentive for the Debtors to move this case forward.

58.     Thus, if an extension is granted, it should be for a shorter period of thirty (30) days and subject to the requirements that: (i) the Debtors complete exploration of reorganization alternatives and (ii) file a chapter 11 plan to refinance and/or sell the Property at public auction.

## RESERVATION OF RIGHTS

59. The Secured Creditor expressly reserves its right to amend or supplement this Objection, to introduce evidence opposing the Exclusivity Application at the hearing on the Exclusivity Application, and to file additional and supplemental objections as the Secured Creditor deems advisable.

## CONCLUSION

60. For the reasons set forth above, the Debtors have failed to meet its burden to establish cause to extend exclusivity. As such, this Court should deny Debtors' Exclusivity Application in its entirety, or, in the alternative, grant an extension of only 30 days.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**WHEREFORE**, the Secured Creditor respectfully requests that the Debtors' Exclusivity Application be denied in its entirety or, in the alternative, grant an extension of only 30 days, together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
      June 4, 2021

                              KRISS & FEUERSTEIN LLP

By:    *s/ Jerold C. Feuerstein*
       Jerold C. Feuerstein, Esq.
       Daniel N. Zinman, Esq.
       Stuart L. Kossar, Esq.
       360 Lexington Avenue, Suite 1200
       New York, New York 10017
       (212) 661-2900
       (646) 454-4168 – facsimile
       jfeuerstein@kandfllp.com
       dzinman@kandfllp.com
       skossar@kandfllp.com

       *Attorneys for 159 Broadway Avenue 1 LLC*